*866 LIU, J.,
Concurring. — I agree with today’s opinion that the phrase “living separate and apart” in Family Code section 771, subdivision (a) (hereafter section 771(a)) “refers to a situation in which spouses are living in separate residences and at least one of them has the subjective intent to end the marital relationship, which intent is objectively evidenced by words or conduct reflecting that there is a complete and final break in the marriage relationship.” (Maj. opn., ante, at p. 864.) I also agree that it remains open “whether there could be circumstances that would support a finding that the spouses were ‘living separate and apart,’ i.e., that they had established separate residences with the requisite objectively evidenced intent, even though they continued to literally share one roof.” (id. at p. 864, fn. 7.) I write separately to note that in addressing that question, courts should understand the purpose of section 771(a) in light of relevant changes in historical context that have occurred since 1870 when the Legislature enacted the original version of the statute.
The phrase “living separate and apart” first appeared in an uncodified 1870 statute titled “An Act to protect the rights of married women in certain cases.” (Stats. 1870, ch. 161, p. 226 (hereafter the 1870 Act).) This statute provided that “[t]he earnings and accumulations of the wife . . . , while the wife is living separate and apart from her husband, shall be the separate property of the wife.” (Id., § 2, p. 226.) The 1870 Act further provided that a wife “living separate and apart from her husband” had “sole and exclusive control [over] her separate property,” could “sue and be sued” without joinder of her husband, and could “avail herself of and be subject to all legal process in all actions, including actions concerning her real estate.” (Id., § 3, p. 226.)
Although the 1870 Act included no definition of “living separate and apart,” the Legislature clearly contemplated separate addresses for the husband and wife. As the court explains, “[s]ection 4 of the 1870 Act provided a procedure for a wife who was ‘living separate and apart’ from her husband to sell her real property without joining with her husband. To do so, the wife was required to record a verified and acknowledged declaration ‘containing a description of such real estate, the name of her husband, her own place of residence, and [stating] that she is a married woman, living separate and apart from her husband.’ (1870 Act, Stats. 1870, ch. 161, § 4, p. 226, italics added.) The statutory requirement that the wife state in a declaration ‘her own’ place of residence that is ‘separate and apart from her husband’ strongly suggests that the 1870 Act was directed at a situation where the spouses had physically separated and the wife in fact had ‘her own’ residence.” (Maj. opn., ante, at p. 854.)
Today’s opinion accurately describes the context and purpose of the 1870 Act. At the time, “married women had very limited power over their property. *867 In the absence of a binding premarital agreement, the husband had the absolute right of ‘management and control’ of the community property of the marriage, including the power of sale of assets,” as well as considerable power over the wife’s separate property. (Maj. opn., ante, at p. 854.) “[Ujnder the statutory scheme in effect in 1870, until entry of a decree of dissolution of the marriage ... , it appears that a woman who was either involved in divorce proceedings or whose husband had deserted or otherwise left her, and who did not have separate property coming within one of the statutory provisions giving her control over it, would have no right of access to the financial sustenance needed to meet the expenses of daily life on her own.” (Id. at p. 855, citation omitted.)
“When read as a whole and in this context, it seems evident that the 1870 Act was intended to afford married women some additional protection from the rigors of the law generally denying them control over their earnings and separate property. Under the authority of the 1870 Act, a wife whose husband was not physically living with her could undertake to support herself in her ‘own’ residence. Unlike other married women, she could retain her earnings and accumulations as her separate property to maintain her separate residence. She was given the right to control and dispose of her separate property. . . . [T]he 1870 Act should be understood as a limited exception to the general rule of that time that the husband had full management and control over the marital and separate assets for the duration of the marriage. It appears the Legislature was concerned only with the special and limited circumstance of a wife who was living physically separate from her husband. Such a wife was likely to be incurring separate expenses associated with her separate residence and could be anticipated to need the authority to separately maintain, control and manage such property. In such a situation, the 1870 Legislature determined an exception to the normal community property characterization of earnings and accumulations acquired during marriage and husband’s control was appropriate.” (Maj. opn., ante, at pp. 855-856.)
The 1870 Act may be understood as a legislative response to cases like Lawrence v. Spear (1861) 17 Cal. 421. There a wife deserted by her husband engaged in a furniture business and sold furniture to the defendant. The husband sued the defendant to void the sale on the ground that he never consented to it. The court upheld the sale based on the legal fiction that the husband, having abandoned the wife, impliedly consented to her disposition of property for her own support. (Id. at pp. 423-424.) This fiction was necessary because the wife had no control over community property and no way to accumulate or control her own separate property, even though she was living separate and apart from her husband. Moreover, divorce did not appear to be a widely accessible option. (See Stevenson & Wolfers, Marriage and Divorce: Changes and their Driving Forces (Spring 2007) 21 J. Econ. Persp. 27, 29, figure 1 (Stevenson & Wolfers) [showing very low rate of divorce in *868 the United States between 1860 and 1900].) The 1870 Act provided a narrow exception to the male-dominated property regime in order to protect a wife in such circumstances.
In 1971, the Legislature amended Civil Code former section 5118, the immediate predecessor of section 771(a), to make the statute gender neutral. The amended statute said: “The earnings and accumulations of a spouse . . . , while living separate and apart from the other spouse, are the separate property of the spouse.” (Stats. 1971, ch. 1700, p. 3640.) As the court notes, this amendment remedied “an inequity that had developed in the treatment of husbands and wives,” whereby a wife living separate and apart from her husband could accumulate separate property before formal dissolution of the marriage, yet the husband could only accumulate separate property after obtaining an interlocutory judgment of dissolution. (Maj. opn., ante, at p. 858.)
Beyond addressing this specific concern, however, it is evident from context that the amended statute served a different purpose than the original 1870 Act. By 1971, the Legislature had long enacted reforms that gave married women control of their own earnings even though such earnings remained community property (Stats. 1951, ch. 1102, pp. 2860-2861), and by 1975, the Legislature had abandoned the male-controlled community property regime in favor of giving both spouses equal control (Stats. 1973, ch. 987, pp. 1897-1905; Stats. 1974, ch. 11, pp. 3590-3591). (See Prager, The Persistence of Separate Property Concepts in California’s Community Property System, 1849-1975 (1976) 24 UCLA L.Rev. 1, 65-67, 73-74 & fn. 350.) Moreover, divorce had become more common by 1971 (Stevenson & Wolfers, supra, 21 J. Econ. Persp. at p. 29, figure 1), and two years earlier, California had become the first state in the nation to adopt a no-fault divorce law (Family Law Act, Stats. 1969, ch. 1608, § 8, p. 3314). These reforms occurred in the context of other legal developments promoting gender equality. (See Sail’er Inn, Inc. v. Kirby (1971) 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529]; Reed v. Reed (1971) 404 U.S. 71 [30 L.Ed.2d 225, 92 S.Ct. 251].)
Thus, by 1971, an estranged wife living separate and apart from her husband had no need for a special statutory dispensation to earn and control separate property in order to provide for her own sustenance. She already controlled the portion of the community comprised of her own earnings, and she was soon to have equal control of all community property. Thus, the gender-neutral version of the statute enacted in 1971 no longer served the same protective purpose of the gender-specific 1870 Act. The modem statute is best understood to have a different purpose: Instead of addressing a nonexistent need to free one spouse from the other’s exclusive control of *869 community property, the statute — consistent with contemporary norms of gender equality — evenhandedly recognizes the separateness of each spouse’s earnings and accumulations in situations where the spouses have effectively though not formally ended their marriage. In short, the statute recognizes a separation before divorce that effectively ends the community.
Today’s opinion ascribes to the Legislature a continuing purpose of “protecting a vulnerable spouse” in construing the phrase “living separate and apart” to have the same meaning today as it did in 1870. (Maj. opn., ante, at p. 865.) But whereas a narrow construction of the phrase now “protect[s] the lower earning spouse” by “reducing] the potential for manipulation of a more elastic standard by the higher earner” (ibid.), a narrow construction served no similar protective purpose in 1870. To the contrary, the Legislature in 1870 understood “living separate and apart” narrowly to mean separate addresses because it sought to create “a limited exception to the general rule of that time that the husband had full management and control over the marital and separate assets for the duration of the marriage.” (Id. at p. 867, italics added.) A broader understanding of “living separate and apart” — one that enabled an estranged wife to earn and control separate property without living at a separate address from her husband — would have been more protective of the vulnerable spouse in 1870. Yet it also would have meant greater property rights for married women at the expense of the male-controlled property regime, and there is no indication that the Legislature in 1870 had any interest in fundamentally changing that regime. The 1870 statute was protective because it created an exception to the male-dominated property regime, not because the exception it created was a narrow one.
By 1971, the Legislature had revised the archaic laws granting husbands exclusive control of marital assets, and the original motivation for construing “living separate and apart” narrowly had become obsolete. Now the gender-neutral statute, premised on the legal equality of husband and wife, simply recognizes the separateness of each spouse’s earnings and accumulations at the point when the spouses have effectively but not formally ended the marriage, i.e., when the spouses are “living separate and apart.” Construing this phrase as it appears in the modem statute, I agree that its most natural meaning (maj. opn., ante, at p. 852) as well as practical considerations of clarity and administrability {id. at p. 864) suggest that whether spouses are “living separate and apart” turns not solely on the subjective intent of at least one spouse, but also on an objective manifestation of that intent by some form of physical separation. However, countervailing considerations of family economics and parenting (ibid.) suggest that the physical separation need not assume the precise form that the Legislature in 1870 envisioned, namely, separate addresses.
*870 In considering whether spouses living under the same roof are “living separate and apart” for purposes of section 771(a), we are not bound by the 1870 Legislature’s narrow understanding of that term. Rather, in light of the current purpose of section 771(a), the question is whether the spouses, in addition to their intent to separate, have demonstrated “unambiguous, objectively ascertainable conduct amounting to a physical separation under the same roof.” (In re Marriage of Norviel (2002) 102 Cal.App.4th 1152, 1164 [126 Cal.Rptr.2d 148].) In order to qualify as “living separate and apart,” the spouses must have a living arrangement that clearly and objectively signals a complete and final termination of the marital relationship. Neither the Legislature nor this court has foreclosed the possibility that such a living arrangement may occur within a single dwelling.
Werdegar, L, concurred.